# In the United States Court of Federal Claims

No. 20-711
(Filed: March 25, 2024)

```
*****************************
MLB TRANSPORTATION, INC.,        *
                                 *
                   Plaintiff,    *
                                 *
         v.                      *
                                 *
THE UNITED STATES,               *
                                 *
                   Defendant.    *
*****************************
```

*James Larry Stine* & *Thomas L. Walker,* Wimberly Lawson, Atlanta, GA, counsel for Plaintiff.

*Daniel B. Volk,* U.S. Department of Justice, Civil Division, Washington, D.C., counsel for Defendant. With whom was *Harold W. Askins III*, U.S. Department of Veterans Affairs, of counsel.

**OPINION AND ORDER**

**Dietz, Judge.**

MLB Transportation, Inc. ("MLB"), a government contractor specializing in the provision of special needs transportation services, seeks damages from the United States for breach of contract under the Contract Disputes Act, 41 U.S.C. §§ 7104 *et seq.* ("CDA"). MLB claims that the Department of Veterans Affairs ("VA") used inflated trip estimates in its procurement of transportation services, engaged in prohibited competition, made an out-of-scope change to the contract, and failed to reimburse MLB for attorneys' fees. The government moves to dismiss MLB's complaint for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") or, alternatively, for summary judgment pursuant to RCFC 56. For the reasons set forth below, the government's motion is **GRANTED-IN-PART** and **DENIED-IN-PART.**

**I.      BACKGROUND**

Leon Gresham served in the United States Navy from 1955 until 1958, when he was honorably discharged with a service-connected disability. *See* App'x to Pl.'s Resp. to Def.'s Mot.[1] [ECF 25-1] at 3-4.[2] After leaving the Navy, Mr. Gresham operated an oil service station

---

[1] The Court cites to the government's motion to dismiss or, alternatively, for summary judgment as "Def.'s Mot."

[2] All page numbers in the parties' briefings refer to the page numbers generated by the CM/ECF system.

and worked in his wife's preschool as a bus driver. *See* App'x to Def.'s Mot. [ECF 20-1] at 590, 592.[3] In the early 2000s, Mr. Gresham began working for his brother-in-law, Michael Baker, at MB Transportation ("MB"). *Id.* at 590-91. Mr. Baker was the sole owner of MB. *Id.* at 603, 624. Mr. Baker is not a veteran. *See, e.g.*, *id.* at 203. Mr. Baker trained Mr. Gresham in management and transitioned him to fleet manager at MB. *Id.* at 593, 620-21. Around 2006, Mr. Baker and Mr. Gresham formed MLB. [ECF 20-1] at 614. They signed a shareholder agreement indicating that it was effective on July 1, 2007. *Id.* at 64, 86. A shareholder certificate record was also prepared, which shows that Mr. Gresham was issued fifty-one shares and Mr. Baker was issued forty-nine shares. *Id.* at 60. The shareholder certificate record states that the shares were issued on January 6, 2006. *Id*. According to Mr. Gresham, he contributed between $5,000 and $10,000 in exchange for his fifty-one percent ownership of MLB. *Id.* at 599. Mr. Gresham later signed a promissory note on August 15, 2009, promising to pay Mr. Baker roughly $900,000 for MLB. [ECF 25-1] at 59-60; *see also* [ECF 20-1] at 705-06.

On March 27, 2009, the VA issued a solicitation seeking contractors to transport patients to and from the Atlanta VA Medical Center ("VAMC") by wheelchair-accessible vans and sedans. Compl. [ECF 1] ¶ 10; [ECF 20-1] at 107. This was a follow-on contract to a 2003 contract performed by MB. *See* [ECF 20-1] at 632-34. However, unlike the 2003 contract, the 2009 contract was set-aside for Service-Disabled Veteran-Owned Small Businesses ("SDVOSB"), and only SDVOSBs were eligible for award. *Id.* at 133. The solicitation called for a one-year contract with four option years. *Id.* at 112. It provided an estimated quantity of 63,000 van trips and 106,000 sedan trips for the 2009-2010 base year. *Id.* at 112. For the option years, the VA estimated a fifteen percent increase in ridership each year. *Id*. The solicitation stated that "[b]ids offering less than 75 percent of the estimated requirement or which provide that the Government shall guarantee any definite quantity, will not be considered." [ECF 20-1] at 142.

The parties offer different documents as the operative solicitation. While nearly identical, the documents offered by each party contain conflicting Federal Acquisition Regulation ("FAR") clauses in Section C.4. The government's document incorporates FAR 52.216-22, Indefinite Quantity (OCT 1995), which provides in relevant part:

> (a) This is an indefinite-quantity contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract.
>
> (b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. The Contractor shall furnish to the Government, when and if ordered, the supplies or services specified in the Schedule up to and including the quantity designated in the Schedule as the "maximum." The Government shall order at least the

---

[3] The appendix attached to the government's motion contains many source documents that cannot be found elsewhere. MLB does not dispute the validity of these documents unless otherwise noted, and it also cites to the government's appendix in its response brief.

>> quantity of supplies or services designated in the Schedule as the "minimum."

*See* [ECF 20-1] at 139-40. By contrast, MLB's document incorporates FAR 52.216-21, Requirements (OCT 1995), which provides in relevant part:

> (a) This is a requirements contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies or services specified in the Schedule are estimates only and are not purchased by this contract. Except as this contract may otherwise provide, if the Government's requirements do not result in orders in the quantities described as "estimated" or "maximum" in the Schedule, that fact shall not constitute the basis for an equitable price adjustment.
>
> (b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. Subject to any limitations in the Order Limitations clause or elsewhere in this contract, the Contractor shall furnish to the Government all supplies or services specified in the Schedule and called for by orders issued in accordance with the Ordering clause. The Government may issue orders requiring delivery to multiple destinations or performance at multiple locations.
>
> (c) Except as this contract otherwise provides, the Government shall order from the Contractor all the supplies or services specified in the Schedule that are required to be purchased by the Government activity or activities specified in the Schedule.

*See* [ECF 25-1] at 37. Under the "Basis of Award" section, both purported solicitations state: "The Government anticipates awarding a single indefinite [delivery] indefinite [quantity] (IDIQ) contract." [ECF 20-1] at 133; [ECF 25-1] at 23. Both solicitations also contain VA Acquisition Regulation ("VAAR") 852.216-70 Estimated Quantities (APR 1984), which states, in relevant part, that "the [VA] shall not be relieved of its obligation to order from the contractor all articles or services that may, in the judgment of the ordering officer, be needed . . . ." [ECF 20-1] at 142; [ECF 25-1] at 39.

On April 25, 2009, Mr. Baker submitted a proposal on behalf of an entity identified as "MB Transportation, Inc. d/b/a MLB Transportation Company." [ECF 20-1] at 103-06. The proposal included a self-certification representing that the offeror is an SDVOSB. *Id.* at 170.[4] On August 1, 2009, the VA awarded the contract to:

---

[4] In 2009, a business entity could self-certify as an SDVOSB. *See* [ECF 20-1] at 711. Thereafter, businesses were required to receive SDVOSB certification from the Center for Veteran's Enterprises ("CVE"). *See* 38 C.F.R. §

3

        M B TRANSPORTATION COMPANY
        MLB TRANSPORTATION

[ECF 20-1] at 210. The award document also stated that the basis of award is an IDIQ contract. *Id.* at 227. At Section C.4, it incorporated FAR 52.216-21, Requirements (OCT 1995). *Id.* at 241. At Section C.9, it incorporated VAAR 852.216-70 Estimated Quantities (APR 1984). *Id.* at 243.

     MLB began performance under the contract on October 1, 2009. [ECF 1] ¶ 33. In November 2009, MLB notified the VA of its concern that actual ridership was much lower than the estimates contained in the solicitation. *Id.* ¶ 37; *see* [ECF 20-1] at 262. According to MLB, in its meeting with the VA, "the contracting officer assured MLB that the VA would deliver the number of trips it placed into the contract and told MLB to increase the size of its vehicle fleet." [ECF 1] ¶ 39. Shortly thereafter, MLB purchased 62 wheelchair-accessible vans and sedans, at a total cost of $1,665,000. *Id.* ¶ 40.

     Despite the VA's alleged assurances, actual ridership during the five years of the contract did not reach the solicitation's estimates. [ECF 1] ¶ 41. Base year van trips reached 76.7% of the estimated volume. *Id*. Van trips during the four option years reached 59.2%, 51.7%, 42.2%, and 38.2% of the estimated volume, respectively. *Id*. Base year sedan trips reached 45.6% of the estimated volume, and sedan trips during the four option years reached 45.6%, 30.5%, 31.9%, and 25.5% of the estimated volume, respectively. *Id.*

     On September 29, 2017, MLB submitted a request for equitable adjustment, seeking compensation for:

> [T]he VA's using grossly negligent/bad faith/fraudulent estimates to suppress the rates for trips and mileage offerors placed into their bids, for the VA using prohibited competition in this requirements contract, for compensation based on increased fuel costs, for backpay paid to employees due to a Department of Labor settlement, for fringe benefit adjustment paid to employees due to the same Department of Labor settlement, for compensation for out[-]of[-]scope change, for attorney's fees, and for interest on late payments.

[ECF 1] ¶ 4; [ECF 20-1] at 377.

     On June 14, 2019, MLB submitted a supplemented and revised version of its September 29, 2017, request for equitable adjustment. [ECF 1] ¶ 5; [ECF 20-1] at 397. MLB withdrew its "claims for compensation for increased fuel costs and interest on late payments and revis[ed] the amounts sought for the prohibited competition, for backpay paid to employees due to the Department of Labor settlement, and for attorney's fees." [ECF 1] ¶ 5. MLB amended its request again on July 22, 2019, to decrease the amount sought for employee backpay and increase the amount sought for attorneys' fees. *Id.* ¶ 6.

---

74.11(a). MLB self-certified for the 2009 contract, but after 2009, it was unable to receive the SDVOSB certification from CVE despite its efforts to do so. *See* [ECF 20-1] at 711.

On September 10, 2019, the contracting officer ("CO") issued a final decision on MLB's request for equitable adjustment that MLB submitted on June 14, 2019, and revised on July 22, 2019.[5] [ECF 1] ¶ 7; [ECF 20-1] at 583. The CO approved MLB's claims for employee backpay based on the Department of Labor settlement and associated fringe benefits. [ECF 20-1] at 583-84. However, the CO denied MLB's claims based on the VA's use of negligent estimates and prohibited competition, the VA's out-of-scope change to the contract, and MLB's request for attorneys' fees. *Id*.

Unsatisfied with the outcome, MLB filed suit in this Court on June 12, 2020. [ECF 1]. In its complaint, MLB claims that it is entitled to compensation because the VA used "grossly negligent/bad faith/fraudulent estimates," engaged in prohibited competition, and made an out-of-scope change to the contract. [ECF 1] ¶¶ 75-77. MLB also claims that it is entitled to attorneys' fees because it had to negotiate with the VA and U.S. Department of Labor – Wage and Hour Division ("WHD") regarding the correct prevailing wage rate applicable to its services and request an equitable adjustment due to the VA's breach of the contract. *Id*. ¶¶ 60-61, 78. On June 9, 2022, the government filed a motion to dismiss MLB's complaint for lack of subject-matter jurisdiction pursuant to RCFC 12(b)(1). [ECF 20] at 1. Alternatively, the government moved for summary judgment pursuant to RCFC 56. *Id*. MLB filed its response on July 26, 2022, [ECF 25], and the government filed its reply on August 8, 2022, [ECF 26]. The Court held oral argument on April 14, 2023. *See* [ECF 27]. On September 11, 2023, the Court ordered supplemental briefing. [ECF 18]. The government filed its supplemental brief on September 25, 2023, [ECF 31], and MLB filed its supplemental brief on September 29, 2023, [ECF 32].

## II.     STANDARDS OF REVIEW

"Whether the court possesses jurisdiction to decide the merits of a case is a threshold matter." *Sandstone Assocs., Inc. v. United States*, 146 Fed. Cl. 109, 112 (2019) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998)). Thus, if the Court determines that it lacks subject matter jurisdiction, it must dismiss the case. RCFC 12(h)(3); *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006). Motions to dismiss for lack of subject matter jurisdiction are governed by RCFC 12(b)(1). In deciding a motion to dismiss for lack of subject-matter jurisdiction, the court accepts all factual allegations in the complaint as true and draws all reasonable inferences in plaintiff's favor. *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). When the government moves to dismiss the complaint under Rule 12(b)(1), the plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. *Tolliver Grp., Inc. v. United States*, 20 F.4th 771, 775 (Fed. Cir. 2021).

Under RCFC 56, summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). An issue is genuine if it "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is material if it might impact the outcome of the

---

[5] In the decision, the contracting officer refers to MLB's June 14, 2019, request for equitable adjustment as the claim submitted on June 18, 2019. [ECF 20-1] at 583. The contracting officer explains that "[t]he original copy was received by certified mail on June 18, 2019." *Id*.

suit under the governing law, while disputes that are irrelevant or unnecessary will not preclude summary judgment. *Id.* at 248. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, which, if satisfied, shifts the burden to the non-moving party to show that a genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). "When ruling on a motion for summary judgment, all of the nonmovant's evidence is to be credited and all justifiable inferences are to be drawn in the nonmovant's favor." *Bai v. Toy Island Mfg. Co.*, 243 F.3d 562, 562 (Fed. Cir. 2000). However, the Court does not "weigh the evidence or determine the truth of the matter but merely determine[s] whether there is a genuine issue for trial." *Plastipak Packaging, Inc. v. Premium Waters, Inc.*, 55 F.4th 1332, 1339 (Fed. Cir. 2022) (internal quotation marks omitted).

### III. DISCUSSION

The government argues that MLB falsely certified its status as an SDVOSB, and, because of its false certification, no valid contract was formed. [ECF 20] at 22. It contends that this "conclusion is fatal both to MLB's claims on the merits and to its effort to establish jurisdiction in this Court, which depends on the existence of a contract between MLB and the Government." *Id.* at 8. The government further argues that it is entitled to summary judgment on MLB's claims for compensation based on trip volume estimates, prohibited competition by the VA, out-of-scope change to the contract, and attorneys' fees "because there is not sufficient evidence to allow MLB to prevail on any of its claims." *Id.* at 23. For the reasons explained below, the Court finds that it has subject matter jurisdiction to consider MLB's complaint. The Court also finds that the government is entitled to summary judgment on MLB's claims based on trip volume estimates and prohibited competition. However, genuine issues of material fact preclude granting summary judgment on MLB's status as an SDVOSB, on its claim that the VA made an out-of-scope contract change, and on its claim for attorneys' fees.

#### A. MLB's Status as an SDVOSB

The government argues that MLB cannot establish the existence of a valid contract with the government because the contract is void *ab initio* due to MLB falsely certifying that it is a SDVOSB, [ECF 20] at 17, and that "[t]he Court should dismiss the complaint or grant summary judgment for the government on this basis[,]" *id.* at 23. The government further states that "[t]he offer MLB submitted purported to be an offer on behalf of an SDVOSB, even though MLB was not owned or controlled by a veteran." *Id.* at 20. In support of its argument, the government contends that "the evidence demonstrates that Mr. Gresham's 51 percent ownership was a sham designed to obtain the contract" and that "[a]t this point, it is not sufficient for MLB to rest on allegations." *Id.* at 21. It proffers that whether a valid contract was formed is a threshold determination because, if MLB cannot establish the existence of a valid contract, its "claims will fail on the merits" and "leave the Court without jurisdiction." *Id.* at 16. According to the government, "[t]o establish a genuine factual issue for trial, MLB must put before the Court evidence on which a reasonable trier of fact could conclude that Mr. Gresham's purported ownership interest was legitimate." *Id.* at 21.

The Court disagrees that MLB's failure to establish the existence of a valid contract deprives this Court of jurisdiction to hear its claims. "[T]he law is clear that, for the Court of

6

Federal Claims to have jurisdiction, a valid contract must only be pleaded, not ultimately proven." *Total Med. Mgmt., Inc. v. United States*, 104 F.3d 1314, 1319 (Fed. Cir. 1997); *accord Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1353 (Fed. Cir. 2011); *Gould, Inc. v. United States,* 67 F.3d 925, 929 (Fed. Cir. 1995); *Spruill v. Merit Sys. Prot. Bd.,* 978 F.2d 679, 686 (Fed. Cir. 1992). Here, it is undisputed that MLB's complaint alleges the existence of an express contract. The government's contention that the contract is void because of an alleged false certification by MLB does not divest this Court of subject-matter jurisdiction over MLB's complaint. *See Gould Inc.,* 67 F.3d at 929. The Court must exercise jurisdiction over MLB's complaint to determine whether MLB falsely certified its status as a SDVOSB, which involves questions of fact. *Id*. at 930.

The government also contends that it is entitled to summary judgment on this issue. [ECF 20] at 10. It argues that Mr. Baker formed MLB because MB, his existing transportation company, was ineligible for the 2009 SDVOSB set-aside contract and that the two businesses were "largely interchangeable." *Id*. Additionally, it asserts that "Mr. Gresham did not invest any money or make any capital contribution in MLB," *id.*, that documents routinely stated that MB was "doing business as" MLB or vice versa, *id.* at 11, that "MB's vans became MLB's vans, apparently without any formalities," and that "the proposal was submitted by 'MB . . . dba [doing business as] . . . MLB[,]'" *id.* (alteration in original). It further asserts that "Mr. Baker signed the proposal as 'President/CEO,'" that he "indicated that [he] is the only person authorized to sign contracts and paper work on behalf of MB Transportation," and that he "supplied the tax identification number of MB rather than MLB." *Id.* According to the government, "[t]he proposal described Mr. Gresham as the company's 'fleet manager,' apparently ranking below the General Manager, who handled day-to-day operations." [ECF 20] at 11. Moreover, the government notes that "Mr. Gresham never received any distribution of profit from MLB" and "was apparently never classified as an employee," but rather referred to as a consultant in MLB's payroll journal. *Id*. at 14.

In response, MLB argues that Mr. Baker and Mr. Gresham created the entity to provide a source of income for Mr. Gresham and his spouse, whose "daycare business was experiencing financial hardship, forcing [them] to borrow money from Mr. Baker." Pl.'s Resp. [ECF 25] at 9. It further states that, in 2006, when Mr. Baker and Mr. Gresham signed the shareholder agreement, Mr. Gresham "put what little money he had into the company – between $5,000 and $10,000 – and later Mr. Gresham signed a $983,000.00 promissory note to MLB." *Id*. MLB maintains that "MLB and MB Transportation were separate and distinct companies" and that "Mr. Gresham owned 51% of MLB." *Id*. at 10. MLB asserts that "Mr. Gresham's majority ownership of MLB gave him both short term and long-term control of the company" and that "Mr. Gresham took many actions evidencing control of MLB." *Id.* It avers that "Mr. Gresham received $2,000 every two weeks" and that he "took a lower salary because he owed $983,000 to MLB pursuant to the promissory note he signed and planned to take a higher salary once the company became profitable." *Id*. at 13. Further, MLB contends that it "also compensated Mr. Gresham indirectly" by paying for his house note and monthly car payment, gas, and insurance for his spouse's car and that Mr. Gresham's spouse received compensation "for coming into the office and ensuring that Mr. Gresham's files were in order." *Id*. at 10.

The Court finds that genuine issues of material fact exist with respect to MLB's status as an SDVOSB because MLB has presented evidence on which a reasonable trier of fact could conclude that it properly self-certified as an SDVOSB. The requirements for qualification as an SDVOSB are set forth in 13 CFR § 125 (2009).[6] In relevant part, the requirements state:

> A concern must be at least 51% unconditionally and directly owned by one or more service-disabled veterans.
>
> * * *
>
> [T]he management and daily business operations of the concern must be controlled by one or more service-disabled veterans. Control . . . means that both the long-term decisions making and the day-to-day management and administration of the business operations must be conducted by one or more service-disabled veterans.
>
> * * *
>
> A service-disabled veteran must hold the highest officer position in the concern (usually President or Chief Executive Officer) and must have managerial experience of the extent and complexity needed to run the concern. The service-disabled veteran manager need not have the technical expertise or possess the required license to be found to control the concern if the service-disabled veteran can demonstrate that he or she has ultimate managerial and supervisory control over those who possess the required licenses or technical expertise.
>
> ***
>
> In the case of a concern which is a corporation, at least 51% of the aggregate of all stock outstanding and at least 51% of each class of voting stock outstanding must be unconditionally owned by one or more service-disabled veterans.

---

[6] 13 C.F.R §§ 125.9-125.13 governed the eligibility requirements for the [Service-Disabled Veteran-Owned Small Business Concern ("SDVO SBC")] Program in 2009. *See* 13 C.F.R §§ 125.9-125.13 (2009). Because 13 C.F.R §§ 125.9-125.13 were the controlling provisions at the time the subject contract was entered, they govern in this case. *See Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005) ("As an initial matter, we note that the Army regulations in effect at the time of [plaintiff's] discharge . . . , rather than current regulations, guide our analysis."). Accordingly, the Court does not consider the government's briefing on the subsections establishing a rebuttable presumption of non-service-disabled-veteran control. *See* [ECF 20] at 21. These subsections were not in effect at the time the contract was entered.

13 C.F.R. § 125.9-10 (2009) (cleaned up).[7]

Here, it is undisputed that Mr. Gresham is a disabled veteran. Also, MLB presented evidence of a Shareholder Record and Shareholders' Agreement designating fifty-one percent of the stock and ownership of MLB to Mr. Gresham. [ECF 20-1] at 60, 87. Further, MLB presented evidence that Mr. Gresham exercised both day-to-day and long-term control over MLB and had ultimate managerial and supervisory control over MLB. Mr. Gresham testified that he was responsible for the fleet of vehicles, *id.* at 607, that he negotiated service contracts, *id.* at 594, and that the staff believed him to be in charge, *id.* at 600. According to Virginia Baker, MLB's Contract Manager, *see id.* at 650, Mr. Gresham conducted monthly management meetings with her, Mr. Baker, and MLB's General Manager. [ECF 20-1] at 661. She also testified that Mr. Gresham had monthly meetings with the VA to review MLB's contract performance, *id.* at 661, 694, and that he conducted regular staff meetings and selected MLB's vendors and suppliers, *id.* at 660. In sum, there are genuine issues of material fact relating to Mr. Gresham's ownership, position, and involvement in MLB that preclude granting summary judgment on the issue of whether MLB properly self-certified as an SDVOSB.

### B.    MLB's Claims Based on Trip Volume Estimates

MLB alleges that "the VA did not rely on factual, experiential, or statistical data to calculate the estimated number of trips and mileage traveled, which it included in the solicitation." [ECF 1] ¶ 14. MLB explains that the VA provided the estimates "to enable offerors to price their bids for the services appropriately and so offerors could decide whether it made economic sense to submit a bid," *id.* ¶ 11, and that "the Solicitation warned offerors that '[b]ids offering less than 75 percent of the estimated requirement [of trips] or which provide that the Government shall guarantee any definite quantity [of trips], will not be considered[,]'" *id.* ¶ 13. Based on information it obtained pursuant to a June 2017 Freedom of Information Act ("FOIA") request, MLB argues that the "[i]nternal estimate bears no relationship to the estimates" in the solicitation. *Id*. ¶¶ 14-15. MLB states that it "reasonably relied upon the VA's multiple presentations of its estimates and priced its bid accordingly." *Id*. ¶¶ 91, 102, 111.

The government argues that MLB's claims regarding trip volume estimates are "time-barred because they were not presented to the [CO] within the CDA's six-year statute of limitations." [ECF 20] at 23. It contends that "MLB effectively concedes that it was aware of its claims regarding 'the VA's inflated estimates,' by November 2, 2009, when MLB met with a VA contracting representative to present its analysis of the discrepancy in trip volume" and that "MLB did not assert a claim regarding trip volume in 2009 or at any time over the next six years." *Id*.

In its response, MLB argues that it did not submit its claims in November 2009 because the CO "told MLB that the trips would increase, yet another fraudulent inducement by the Defendant." [ECF 25] at 23. It then states that "MLB submitted a timely claim letter for the grossly negligent estimates on September 29, 2017," *id.*, and that MLB "made its initial claim on

---

[7] The Court omits the portions of § 125 that reference circumstances in which a veteran owner has a permanent or severe disability as those portions are not relevant to the case at hand.

either July 11, 2013 or January 10, 2014; well within the 6 years date from September 2009 signature of the contract," *id*. MLB states that "[d]amages continue to accrue throughout the 5 years of the contract[.]" *Id*.

The CDA requires that "a contractor [] submit a claim to the Contracting officer within six years of the accrual of the claim." *Env't Safety Consultants, Inc. v. United States,* 97 Fed. Cl. 190, 195 (2011); 41 U.S.C. § 7103(a)(1), (4). "'Each claim by a contractor against the Federal Government relating to a contract shall be in writing,' and 'shall be submitted to the contracting officer for a decision.'" *Sharp Elecs. Corp. v. McHugh,* 707 F.3d 1367, 1371 (Fed. Cir. 2013) (quoting 41 U.S.C. § 7103(a)(1)-(2)). A claim accrues on "the date when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known. For liability to be fixed, some injury must have occurred. However, monetary damages need not have been occurred." *Square One Armoring Servs. Co. v. United States*, 162 Fed. Cl. 429, 435-36 (2022) (quoting 48 C.F.R. § 33.201).

The Court finds that MLB's claims based on trip volume estimates accrued by no later than November 2, 2009. There are four distinct events that needed to occur for liability to be fixed with respect to MLB's claims based on trip volume estimates: (1) execution of the contract between MLB and the VA, (2) the VA's purported obligation to provide MLB with the estimated trip volumes reflected in the contract, (3) the VA's failure to meet the estimated trip volumes, and (4) MLB's incurring damages as a result of the VA's failure to meet its purported obligation. *See e.g.*, *Kan. City Power & Light Co. v. United States*, 143 Fed. Cl. 134, 142 (2019) (analyzing the elements of a breach of contract claim) (citing *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989)); *see also Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998) ("Generally, '[i]n the case of a breach of a contract, a cause of action accrues when the breach occurs.'") (quoting *Mfrs. Aircraft Ass'n v. United States*, 77 Ct. Cl. 481, 523 (1933)). The undisputed facts establish the dates for each of these events. The parties executed the contract on July 29, 2009. [ECF 1] ¶ 28; [ECF 20-1] at 210. The VA's obligation to meet the estimated trip volumes in the contract would have attached at the time performance under the contract began on October 1, 2009. [ECF 1] ¶ 33. By MLB's own admission, it became aware that the VA was not meeting the estimated trip volumes by November 2, 2009, the date on which it met with the VA "seeking a modification of the trip rate to accommodate the reduced volume." *Id*. ¶ 37. Lastly, MLB incurred damages as soon as the first month's trip volumes did not meet the estimates contained in the contract. *See id*. ¶¶ 35-36, 38. Accordingly, MLB needed to submit its claims by November 2, 2015, for them to be timely.

None of the submissions identified by MLB constitute a valid claim that complies with the CDA's six-year statute of limitations. The September 29, 2017, request for equitable adjustment does not fall within six years of November 2, 2009, the latest date on which the claim accrued. Further, the July 11, 2013, claim letter did not contain any claims based upon the trip volume estimates in the contract. *See* [ECF 20-1] at 330-341. Instead, it sought reclassification of the designation of MLB's services from taxi services to shuttle services, an issue entirely distinct from the alleged inflated trip volume estimates. *Id*. at 330. Accordingly, it cannot serve as a timely claim based on the trip volume estimates under the CDA. *See Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003) ("An action brought before the Court of Federal Claims under the CDA must be based on the same claim previously presented to and denied by

10

the contracting officer.") (internal quotation marks omitted). Additionally, the July 11, 2013, claim letter was withdrawn by MLB in its January 10, 2014, letter. *See* [ECF 20-1] at 330, 341.

Finally, MLB's January 10, 2014, letter, although timely, does not constitute a valid claim under the CDA. To qualify as a claim under the CDA, a contractor is required to submit "a written demand or written assertion . . . seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract." *Zafer Constr. Co. v. United States*, 40 F.4th 1365, 1367 (Fed. Cir. 2022). If the claim exceeds $100,000, the contractor is required to certify its claim pursuant to 41 U.S.C. § 7103(b)(1) and FAR 52.233-1(d)(2)(iii). Furthermore, "a contractor must show that 'what the contractor desires by its submission is a final decision' from the contracting officer determining whether the contractor is entitled to the claimed amount." *Zafer*, 40 F.4th at 1367 (quoting *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327-28 (Fed. Cir. 2010)). MLB's January 10, 2014, letter does not demonstrate that it is seeking a final decision from the contracting officer. MLB begins the letter by stating: "Please consider this a preliminary request for an equitable adjustment." [ECF 20-1] at 341. It goes on to state:

> Although some details regarding each of these [items] are provided below, we would like to meet with you in the hopes of conducting this discussion and negotiation as amicably as possible. MLB will follow up with another letter which will include actual proposed numbers or formulas to correspond to each of these items in more detail.

*Id*. at 343. MLB concludes by stating that "[o]ver the course of the next week or so, we will be putting together some detailed numbers for each of [the] items [in the letter]." *Id*. at 350.

The content of this letter does not put the CO on notice that MLB is requesting a final decision under the CDA. *See Zafer*, 40 F.4th at 1368. The letter does not mention the CDA and instead indicates that MLB intends to seek an equitable adjustment in a subsequent submission that will include actual amounts claimed and supporting information. Moreover, the letter fails to include any form of the statutorily required certification, whether as required for a request for equitable adjustment or a CDA claim. *Compare id.* at 1366 (finding that the contractor's request constituted a valid CDA claim, in part, because the contractor "certified its request in accordance with the claim certification requirement of 41 U.S.C. § 7103(b)(1), going beyond what is required by 48 C.F.R. § 252.243-7002(b) to certify mere requests for equitable adjustment"). While a defective certification is subject to cure, a complete lack of certification is not. *See CSX Transp., Inc. v. United States*, 123 Fed. Cl. 244, 252 (2015) (holding that the contractor's claim was not valid where the contractor failed to certify the claim). Therefore, MLB's claims for trip volume estimates are time-barred and the government is entitled to summary judgment on this issue.

Although MLB argues that its claims were timely, it does not specify when it believes its claims accrued or how the referenced events affected the timing of that accrual. Further, MLB does not argue that the Court should apply the doctrine of equitable tolling. Despite this, the Court notes that even if MLB had made such an argument, the circumstances do not justify the

11

application of the doctrine to this case. *See Env't Safety Consultants, Inc. v. United States,* 97 Fed. Cl. 190, 201 (2011) (holding that the contractor was not entitled to equitable tolling where it neither argued that the doctrine should apply nor presented evidence that application of the doctrine was warranted). The CDA's presentment clause is subject to equitable tolling in appropriate circumstances. *Arctic Slope Native Ass'n v. Sebelius,* 583 F.3d 785, 798 (Fed. Cir. 2009). However, "the doctrine of equitable tolling 'is a narrow doctrine' that enables courts to toll the statute of limitations for compelling justifications." *Roth v. United States,* 73 Fed Cl. 144. 153 (2006) (quoting *Martinez v. United States,* 333 F.3d 1295, 1318 (Fed. Cir. 2003)). A "litigant is entitled to equitable tolling of a statute of limitations only if the litigant establishes two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 255 (2016) (internal quotation marks omitted). Here, under the extraordinary circumstances prong, MLB would be required to show that "the circumstances that caused [its] delay are both extraordinary *and* beyond its control." *Menominee*, 577 U.S. at 257 (emphasis in original). MLB does not present any evidence that extraordinary circumstances beyond its control caused a delay in its claim filing. MLB's assertion that it relied on the CO's statement that trips would increase does not suggest that the CO engaged in misconduct. *See Al-Juthoor Contracting Co. v. United States*, 129 Fed. Cl. 599, 616 (2016). Nor does such a statement by the CO create extraordinary circumstances outside of MLB's control that prevented MLB from timely filing a claim. *Menominee*, 577 U.S. at 255. Moreover, MLB's 2017 FOIA request does not justify equitable tolling because MLB has not demonstrated extraordinary circumstances outside of its control that prevented it from filing the FOIA request prior to 2017, thereby discovering its claim sooner.

      **C.**      **MLB's Claims Based on Prohibited Competition**

MLB also alleges that the VA was required to use MLB to provide trips for all eligible VA beneficiaries because the contract contains FAR 52.216-21, Requirements (Oct 1995). [ECF 1] ¶ 80. MLB states that "the VA began competing with MLB in 2011 by using its own vehicles and using other companies to transport VA beneficiaries to appointments[.]" *Id*. ¶ 43. Further, it argues that "[d]espite the VA's contractual requirement that it use MLB for all beneficiary transportation services until reaching the estimated number of trips, the VA materially breached the contract by taking trips away from MLB, performing its own transportation services and contracting with others to provide transportation services." *Id*. ¶ 46.

The government contends that the VA "has no purchase obligation beyond ordering the guaranteed minimum" because the contract is an IDIQ contract, not a requirements contract. [ECF 20] at 25. The government argues:

> [E]ven though it would not have been possible to form a valid requirements contract based on the terms of the solicitation, the VA's error in including the requirements FAR clause, rather than the IDIQ clause, in the award document admittedly creates an ambiguity on the face of that document, at least when read alone.

12

*Id*. at 26. However, it also argues that this mistake created a patent ambiguity such that MLB was obligated to inquire and that "[b]ecause MLB failed to inquire, its interpretation cannot be accepted." *Id*. at 26-27. Finally, it states that "[t]here is no possibility of MLB demonstrating that it relied on a belief that this was a requirements contract in preparing its proposal pricing." *Id*. at 27.

In response, MLB asserts that "genuine issues of material fact remain as to the nature of the contract and the extent of MLB's reliance upon the Government's representations and estimates." [ECF 25] at 25. It argues that that the contract is ambiguous and thereby reasonably susceptible of more than one interpretation. *Id*. at 23. MLB contends that "all of the 'patent ambiguity' cases Defendant cites involved ambiguities within a contract, not between a solicitation and the later contract," *id*. at 27, and that "Defendant must concede that in the solicitation the VA inserted the requirements FAR clause," *id*. at 25. The Court finds that there are genuine issues of material fact that preclude the Court from identifying the operative solicitation. Nevertheless, the Court also finds that MLB's interpretation of the contract as a requirements contract is barred by the patent ambiguity doctrine.

When the "provisions of the [contract] are phrased in clear and unambiguous language, they must be given their plain and ordinary meaning[.]" *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc) (citing *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996)). However, when a contract is susceptible to more than one reasonable interpretation, it contains an ambiguity. *Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 751 (Fed. Cir. 1999). "Ambiguities in a government contract are normally resolved against the drafter." *Triax Pac., Inc. v. West*, 130 F.3d 1469, 1474 (Fed. Cir. 1997). However, the patent ambiguity doctrine is an exception to this rule, requiring that a contractor inquire about "ambiguities that are judged so 'patent and glaring' that it is unreasonable . . . not to discover and inquire about them." *Id.* at 1475.

Here, not only do the parties dispute the type of contract at issue, but they also dispute which document is the operative solicitation. In the government's view, the solicitation unambiguously solicited offers for an IDIQ contract because it stated the basis of award as an IDIQ contract and contained the IDIQ FAR clause at Section C.4. *See* [ECF 20] at 13, 27; *see also* [ECF 20-1] at 133, 139-40. Thus, the government contends that the ambiguity did not arise until the VA mistakenly inserted the FAR requirements clause at Section C.4 in the award document. *Id.* at 27. In MLB's view, both the solicitation and the award document identified the basis of award as an IDIQ contract, yet both documents contained the FAR requirements clause at Section C.4, and thus, the ambiguity arose prior to the award document. *See* [ECF 25] at 25-26; *see also* [ECF 25-1] at 23, 37; [ECF 20-1] at 227, 241.[8]

---

[8] Although ultimately irrelevant to the Court's analysis, the Court notes that MLB's position is muddied by the fact that the arguments advanced in its briefing contradict the allegations made in its complaint. In its complaint, MLB alleges that "Section C.4 of the Solicitation stated that this would be an indefinite quantity contract." [ECF 1] ¶ 17. It further alleges that the VA amended the solicitation on April 26, 2009, and that the amended solicitation changed Section C.4, making it a requirements contract. *Id.* ¶¶ 19, 23. However, in its response to the government's motion and in its supplemental brief, MLB asserts that "the March 27, 2009, Solicitation, [] included a Requirement section," [ECF 25] at 25, and that "on April 26, 2009, [] the VA amended the solicitation to make this an IDIQ." [ECF 32] at 9. MLB further states in its supplemental brief that "[t]he amended solicitation omitted any mention of

13

Irrespective of the parties' disagreement surrounding the operative solicitation, the Court finds that both versions of the solicitation contain a patent ambiguity as to the type of contract such that MLB had a duty to inquire prior to bidding. It is undisputed that both solicitations (and the award document) state the basis of award as an IDIQ contract. [ECF 25-1] at 23; [ECF 20-1] at 133, 227. Each of these documents also contains VAAR 852.216-70 Estimated Quantities (APR 1984), which states, in relevant part, that "the [VA] shall not be relieved of its obligation to order from the contractor *all articles or services* that may, in the judgment of the ordering officer, be needed . . . " [ECF 25-1] at 39 (emphasis added); *see also* [ECF 20-1] at 142, 243. Therefore—regardless of which FAR clause was incorporated at Section C.4—the language in VAAR 852.216-70 is facially inconsistent with the stated basis of award, raising MLB's duty to inquire. *See Stratos Mobile Networks USA, LLC v. United States,* 213 F.3d 1375, 1381 (Fed. Cir. 2000) ("A patent ambiguity is present when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties."). A solicitation that clearly states the basis of award as an IDIQ contract yet contains a provision which obligates the government to order all articles or services from the contractor would place a reasonable contractor on notice and prompt it to rectify the inconsistency. MLB's failure to do so precludes its interpretation of the contract as a requirements contract.[9] Accordingly, the government is entitled to summary judgment on MLB's claim for breach of a requirements contract due to prohibited competition.

### D. MLB's Claims Based on Out-of-Scope Change

MLB further alleges that "pursuant to the terms of the contact, the VA was to maintain a transportation office." [ECF 1] ¶ 117. It asserts that, "[a]t the beginning of the contract, the VA had the required employees at the transportation desk[,]" *id.* ¶ 188, but that after MLB worked with VAMC employees to place one to two MLB employees at the VAMC to facilitate pickup and drop-off, *id.* ¶ 199, "the VA started relying on those MLB employees to perform its work and the VA shut down its own transportation desk[,]" *id.* ¶ 120. It further asserts that "by failing to assign employees to the transportation desk and by relying on the one to two MLB employees to man it, the VA has breached the contract by creating an out[-]of[-]scope change and not paying for those additional services as requested." *Id.* ¶ 122. The government argues that "there is no evidence that the VA changed the contract or in any way directed MLB to provide employees or service beyond the scope of the contract." [ECF 20] at 33. To the contrary, the

---

the change from a 'requirements' contract – for which the VA had solicited bids in March to an IDIQ in April – in its summary of changes." *Id*.

[9] MLB states that it did not understand what IDIQ stood for and that "[t]he government should not be allowed to mislead those bidding on contracts and then take advantage of their lack of sophistication." [ECF 25] at 24. However, "the presence or absence of a patent ambiguity is not determined by the contractor's actual knowledge, but rather by what a *reasonable contractor* would have perceived in studying the bid packet." *Triax Pac., Inc.*, 130 F.3d at 1475 (emphasis added). Further, the stated basis of award as an IDIQ contract also prevents MLB from being able to demonstrate that it relied on its interpretation of the contract as a requirements contract in preparing its bid. *See Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986) ("It is also well settled that where a contractor seeks recovery based on [its] interpretation of an ambiguous contract, [the contractor] must show that [it] relied on this interpretation in submitting [its] bid.").

government contends that "the facts are not in accord [with] MLB's allegations" that "the VA required MLB to provide employees to work on-site at the VA's Atlanta Medical Center" because "[a]ccording to Mr. Baker's 2009 affidavit, it was he who requested that the VA allow MLB to place its employees at the Medical Center, not the other way around." *Id*. at 32-33. It further argues that "MLB's claim regarding its on-site employees is also barred by the CDA's six-year statute of limitations for claim presentment." *Id*. at 33.

There are genuine issues of material fact that preclude summary judgment on the issue of whether the government made an out-of-scope change to the contract that entitles MLB to compensation. While the government argues that the VA did not require MLB to provide employees at the dispatch desk, it misunderstands MLB's claim. MLB does not appear to dispute that it made the request. *See* [ECF 1] ¶ 199. In fact, the evidence supports a conclusion that MLB made such a request. *See* [ECF 20-1] at 290, 308. Rather, MLB alleges that, after it placed its employees at the VAMC dispatch desk, the VA shut down its transportation desk and began relying on the MLB employees. [ECF 1] ¶ 120. Therefore, the government's argument that MLB made the request to place its employees at the VAMC does not demonstrate the absence of a genuine issue of material fact with respect to whether an out-of-scope change occurred.

Additionally, there are genuine issues of material fact with respect to whether MLB's claim falls within the CDA's six-year statute of limitations. The government argues that the claim is time-barred because "[i]t is clear that MLB began placing these employees on-site in 2009, and . . . MLB failed to assert this claim in 2009, or in the six years thereafter." [ECF 20] at 33. The government cites an affidavit of Michael Baker wherein he states that, in an email dated January 29, 2009, he requested that an MLB dispatcher be placed at the VAMC. [ECF 20] at 33 (citing [ECF 20-1] at 293, 89). However, the January 29, 2009, email was sent roughly eight months before contract performance began. Thus, it does not establish when MLB began placing its employees at the VAMC during performance of the contract at issue.[10] Further, the Court notes that MLB included its claim for the alleged out-of-scope change in its September 30, 2016, claim letter. [ECF 20-1] at 354-57, 372-73. Arguably, this claim letter could fall within the six-year statute of limitations depending on when the VA shut down its transportation desk and began relying on MLB employees to perform the alleged out-of-scope services. The timing of these events is unclear from the record evidence and cannot be resolved on summary judgment.

E.    **MLB's Claim for Attorneys' Fees**

Finally, MLB alleges that "[a]s a result of having to respond to the VA and the WHD regarding the correct prevailing wage rate under the [Service Contract Act ("SCA")], having had to request an equitable adjustment due to the SCA, and having had to request an equitable adjustment due to the VA's breaches of contract, MLB has been damaged by incurring at least $463,722.30 in attorneys' fees." [ECF 1] ¶ 78. Citing FAR 31.205-47(f)(1) and *Bill Strong Enters., Inc. v. Shannon*, 49 F.3d 1541 (Fed. Cir. 1995), the government argues that MLB is not

---

[10] MLB's claim letters state that "beginning almost immediately" MLB placed its employees at the VAMC and that "[s]oon thereafter" the VA started relying on these MLB employees and shut down its own transportation desk. *See* [ECF 20-1] at 349, 372, 389, 410. While these letters suggest that MLB's claim accrued shortly after contract performance began, it does not provide conclusive evidence of the exact timing of the relevant events, such that the Court may determine when MLB's claim accrued and whether it is timely.

15

entitled to attorneys' fees because "attorney fees incurred to pursue claims against the Government are not recoverable damages" and "MLB does not identify any contractual basis for it to recover such fees in this case." [ECF 20] at 34.

There are genuine issues of material fact that preclude summary judgment on MLB's claim for attorneys' fees. FAR 31.205-47(f)(1) states that legal costs are unallowable if they are incurred in connection with "the prosecution of claims or appeals against the Federal Government." *Bill Strong* stands for the proposition that the allowability of legal costs depends on whether the costs were incurred in furtherance of contract administration (and therefore allowable) or claim prosecution (and therefore unallowable). *See Bill Strong*, 49 F.3d at 1549-50; *see also Tip Top Constr., Inc. v. Donohoe*, 695 F.3d 1276, 1283 (Fed. Cir. 2012). "In classifying a particular cost as either a contract administration cost or a cost incidental to the prosecution of a claim . . . courts should examine the objective reason why the contractor incurred the cost." *Bill Strong*, 49 F.3d at 1550. While these authorities may inform the ultimate allowability of MLB's claimed attorneys' fees, the government's bare reliance on these authorities does not demonstrate the absence of a factual dispute with respect to MLB's request for attorneys' fees. MLB alleges that it was "caught in the middle of [a] dispute between the VA and the WHD concerning the appropriate classification for the drivers," [ECF 1] ¶ 59, and that its attorneys "negotiated a comprised rate between the taxicab driver rate and the shuttle bus driver rate," *id*. ¶ 60. MLB included its claim for attorneys' fees in its September 29, 2017, claim letter, [ECF 20-1] at 390, and provided billing records to support its claim, *id*. at 479-515. Aside from its general assertions that the amount sought is unclear and that the billing records do not identify MLB as the client, the government fails to consider the purpose for which MLB incurred the attorneys' fees and thus their allowability.

## IV.   CONCLUSION

For the reasons stated, the government's motion to dismiss or, alternatively, for summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART**. The government's motion to dismiss MLB's complaint for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) is **DENIED**. The government's motion for summary judgment pursuant to RCFC 56 is **GRANTED** with respect to MLB's claims based on trip volume estimates and prohibited competition and **DENIED** with respect to MLB's status as an SDVOSB and its claims based on an out-of-scope contract change and for attorneys' fees. The parties shall file a joint status report proposing further proceedings by **no later than April 8, 2024**.

**IT IS SO ORDERED.**

 s/ Thompson M. Dietz
THOMPSON M. DIETZ, Judge